

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**
TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed February 20, 2008**             **United States Bankruptcy Judge**

---

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
LUBBOCK DIVISION

| | | |
|---|---|---|
| In Re: § | | |
| § | | |
| NORMAN DOYLE HICKS AND § | | CASE NO. 06-50297-RLJ-7 |
| CAROLYN GAY HICKS, § | | |
| § | | |
| Debtors § | | |
| | | |
| E. E. NORWOOD AND FLAT TOP § | | |
| DAIRY GO ROUND, LP § | | |
| § | | |
| Plaintiffs § | | |
| § | | |
| v. § | | ADVERSARY NO. 07-5007 |
| § | | |
| NORMAN DOYLE HICKS, § | | |
| § | | |
| Defendant § | | |

### MEMORANDUM OPINION

E. E. Norwood ("Norwood") and Flat Top Dairy Go Round, LP ("Flat Top Dairy"),

plaintiffs, object under subsections 523(a)(2)(A) and (a)(4) of the Bankruptcy Code to the

dischargeability of debt owed Norwood and Flat Top Dairy by Norman Hicks ("Hicks"), the debtor and defendant in this adversary proceeding.

**Statement of Facts**

1. Norwood is an individual who resides in Goldthwaite, Mills County, Texas. Flat Top Dairy is a limited partnership established under the laws of Texas and is, for all intents and purposes, controlled by Norwood.

2. Hicks is a resident of Pecos, Reeves County, Texas. He and his wife, Norma Hicks, own and control Desert Farms, Inc., a Texas corporation ("Desert Farms").

3. In the Spring of 2003, Hicks formed and began operations of Desert Farms, which operations continued from its formation through and into 2006.

4. Hicks filed this chapter 7 bankruptcy case on November 9, 2006.

5. In the Spring of 2005, for the purpose of financing Desert Farms' operations as a producer of cotton, sorghum, silage, and watermelons, Hicks, joined by Desert Farms, executed and delivered to Norwood a promissory note in the original principal amount of $620,000, bearing interest at the rate of ten percent per annum, and, by its terms, came due on February 1, 2006 (the "note" or the "620K note").[1] The note provided that it was secured by a security agreement signed by Hicks and Desert Farms that granted a security interest in all the crops of Hicks and Desert Farms, which included cotton, sorghum, silage, and watermelons. In addition, the security interest extended to any government subsidy or support payments related to the

---

[1] The relationship between Hicks and Norwood began in late 2002 or early 2003. They had a classic partnership arrangement under which Hicks would conduct farming operations on land owned by Norwood with each splitting the profits on a 50-50 basis. This continued through the 2003 and 2004 crop years. They apparently ceased operating as a partnership in 2005 when they switched to a lending and leasing arrangement.

crops, payments in lieu of growing crops or crop insurance payments for said crops, and proceeds of the crops.

6. The above-referenced security interest was perfected by the filing of a UCC Financing Statement with the Office of the Secretary of State of Texas. The Financing Statement was filed on June 22, 2005; Hicks and Desert Farms are shown as joint debtors and Norwood as the secured party.

7. Hicks grew cotton, sorghum, and watermelons during the 2005 crop year. During 2005 and the beginning months of 2006, Hicks received crop proceeds as the sales of cotton, sorghum, and watermelons occurred.

8. Given the lien on the crops, Hicks was required to obtain Norwood's endorsement to legally deposit or cash any crop-proceeds checks received for the 2005 crop year. Upon receipt of the crop-proceeds checks, Hicks obtained Norwood's endorsement on the checks.

9. By February 1, 2006, Hicks had not paid the note in full, thereby defaulting under the note. The default was a breach of the note.

10. The 620K note was not advanced at once; instead, Norwood and Hicks treated it as a line of credit. Hicks or his bookkeeper would request an advance from Norwood, who would review the request and make an advance. He did not always advance the full amount requested.

11. Norwood made advances from March or April 2005 through October 1, 2006. Norwood Ex. 4.[2] Payments were made by Hicks to Norwood from May 16, 2005 to July 1, 2007. *Id*. The total amount advanced by Norwood to Hicks and Flat Top Dairy was $723,658.88,

---

[2] Norwood's Exhibit 4 reflects the first advance made in the amount of $5,500 on April 18, 2005, but a ledger, Hicks Exhibit 30, reflects an advance of $100,000 on March 5, 2005 and an advance of $14,499.92 on April 7, 2005.

thereby exceeding the face amount of the note. Hicks Ex. 39. The total of all payments made by Hicks to Norwood was $599,585.06. *Id*. The balance on the note, as of July 1, 2007, was $170,668.11, consisting of a principal amount of $160,056.16 and unpaid interest of $10,611.95. Hicks Ex. 41.[3]

12. The total receipts to Hicks or Desert Farms for cotton sales for 2005 was $717,209.88. Norwood Ex. 6. The total receipts to Hicks or Desert Farms for watermelon sales for 2005 was $15,509.22. Norwood Ex. 7. The harvesting expenses incurred for harvesting the watermelons was $9,293.07. *Id*. The total receipts to Hicks or Desert Farms for hay sales was $12,058.20. Norwood Ex. 8. The total receipts to Hicks or Desert Farms for silage sales was $95,033.57. Norwood Ex. 9. The total receipts to Hicks or Desert Farms for seed sales was $33,901. Norwood Ex. 10.

13. The hay was grown on land owned by Flat Top Dairy, the entity owned by Norwood, and it was purchased by Norwood or another entity controlled by Norwood, Cattle Sales Leasing, LLP.

14. The proceeds of cotton sales consisted of checks issued by Plains Cotton Cooperative Association ("PCCA"). The PCCA checks included Norwood, as lienholder, as a payee on the checks. Norwood testified that on at least nine different checks, Hicks requested that he, Norwood, endorse the checks back to Hicks so Hicks could use the funds to pay unpaid bills. For example, on November 7, 2005, Norwood endorsed cotton checks from PCCA for two

---

[3]The evidence is somewhat confusing regarding Norwood's claim. While Hicks Exhibit 41 reflects a principal balance of $160,056.16 and interest of $10,611.95, a separate accounting reflects a principal balance of $124,073.82 and interest of $46,594.29. *See* Hicks Ex. 39 and Hicks Ex. 41. The Court has not reconciled these amounts as the total amount is the same and the parties have not asserted any real dispute regarding the total amount of the debt.

hundred forty-one bales of cotton in the amount of $59,461.13 and allowed Hicks to use a portion of the proceeds to pay expenses. *See* Hicks Ex. 32. On the same date, a payment of $40,000 was credited against the 620K note. *See id.* On November 17, 2005, Norwood endorsed cotton checks presented to him in the approximate amount of $134,000, thereby allowing Hicks to use some of the proceeds to pay bills. *See id.* On the same date, a note payment of $107,242 was made.

15. Norwood testified that he was induced to endorse cotton checks over to Hicks by Hicks's assurances that there was sufficient cotton in storage to pay the debt owed to Norwood. Hicks further advised Norwood that immediate funds were needed to pay outstanding bills. Norwood, in addition, testified that Hicks had told him that he (Hicks) had a good crop, a crop that would allow repayment of the loans made by Norwood.

16. In May of 2005, Flat Top Dairy, as lessor, and Desert Farms and Norman Hicks, jointly as lessees, entered into a "Farming Lease." Hicks Ex. 35. The lease provides that, notwithstanding its date of execution, it was effective April 15, 2005. *Id*. The lease covers farmland in Reeves County and contemplates the lessees' use of the land to plant cotton and sorghum. *Id*. The lease further provides that Desert Farms and Hicks were to pay rent to Flat Top Dairy in the amount of twelve percent of the gross sales price of all crops produced and of "LDP" payments. *Id*. The term of the lease was April 15, 2005 to December 31, 2005. *Id*. The lease provided that the lessor may advance costs of inputs and fuel used for the crops planted by the lessees. *Id*. In such event, the advanced funds were to be paid directly to the providers and repaid by lessees upon sale of the crop(s) with interest at ten percent per annum. *Id*. The lease further provided that all payments from purchasers and government program payments were to

be made directly to the lessor with the lessor paying lessees any amounts due after payment of rents, advanced expenses, and other amounts due to lessor from lessees under the lease. *Id*. The lease provided that all cotton would be ginned at its Coyanosa Gin and stored at Sweetwater, Texas. *Id*.

17. Flat Top, as lessor, and Desert Farms and Hicks, as lessees, entered into similar type leases in 2004 and 2006.[4]

18. Of the gross 2005 cotton-crop proceeds of $717,209.88, the total "net" was $596,076.85. Hicks Ex. 23. The net is derived after subtracting from each cotton sale a relatively small payment to Cotton, Inc., a payment for ginning charges, and payment for rent (which is twelve percent of the gross cotton sale amount less the payment to Cotton, Inc. and less the ginning charges). *Id*. For example, on November 7, 2005, a payment from PCCA for cotton sales was made in the amount of $69,967.91. *Id*. From this, Cotton, Inc. was paid $590.94, ginning charges of $1,807.50 were paid, and rent of $8,108.34 was paid (to Flat Top). *Id*. The "net" amount resulting from this is the sum of $59,461.13, the sum referred to in paragraph 14 above. There were approximately thirteen cotton checks issued to Hicks in payment for the 2005 cotton crop. *Id*. Hicks testified that the net amount, the $596,076.85, was paid to Norwood against the advances. This does not correspond with the fact that of the "net" proceeds derived from the November 7, 2005 cotton check, the $59,461.13, $40,000 of such amount was paid to Norwood. *See* paragraph 14 above.

---

[4] The Farming Lease entered into in April of 2006 includes, in addition to Desert Farms and Hicks as joint lessees, an individual named Daniel Armstrong as a lessee.

19. As stated, the 620K note matured February 1, 2006. The last advance credited against the note in 2005 was made November 9, 2005, in the amount of $5,110.73. Hicks Ex. 39. At such time, the balance on the note was $706,612.77. *Id*. Several advances were made in 2006, most of which were after February 1, 2006. These include a sum of $15,224.12 on January 3, 2006, three $1,600 advances made on February 11, 2006, February 16, 2006, and March 19, 2006, respectively. *Id*. The three $1,600 advances were made by Norwood for payment of labor. An additional advance of $40,557.41 was made on April 15, 2006, which, according to Norwood, constituted sums he paid directly for Hicks's benefit. *Id*. An additional sum of $18,066.71 was added to the note balance by Norwood in late April of 2006, but Norwood could not, during his testimony, recall the purpose of such advance.

20. The total amount of advances made in 2006 was $88,972.17. Hicks Ex. 39. The majority of these advances were made after the stated maturity of the 620K note.

21. Norwood testified that he continued to make advances after February 1, 2006, because he thought he was covered by the security agreement. In this regard, the security agreement states that the liens created therein secure payment of the "obligation in the security agreement and all renewals and extensions of any of the obligations." The obligation in the security agreement is the 620K note. The security agreement does not provide that it secures other advances made by Norwood.

22. In addition to the 620K note, Hicks was obligated to Norwood on another note in the amount of $200,000. This note was secured by farm equipment. Norwood repossessed the farm equipment that secured this note, and, after using the equipment for approximately four months, sold the equipment and realized approximately $170,000 from the sale which was credited against

the debt. In addition, Norwood gave credit for his use of the equipment. Any amount still owing on this $200,000 note is not at issue in this adversary.

23. Though requested during a deposition to do so, Norwood did not provide an itemized list of transactions or advances that he contends were procured by fraudulent means on Hicks's part. Instead, Norwood submits that had Hicks turned over all crop proceeds, there would have been sufficient proceeds to repay the advances in full and that as he allowed Hicks to use crop proceeds by endorsing checks over to Hicks, Hicks represented to him that there was sufficient other crops to cover the additional advances represented by the turned-over funds. He also testified that, on occasion, Hicks used the turned-over funds to pay personal expenses rather than bills incurred in the farming operation. For example, Norwood testified that Hicks used approximately $34,000 for a house payment.

24. Hicks and Norwood, personally or through their respective entities, entered into an agreement whereby Norwood would purchase hay produced in 2006 on land covered by the farm lease. A dispute arose regarding the hay purchase and they attempted to resolve the dispute by negotiating the purchase price of hay down from $62,000 to $45,000. The hay was cut and left in the field. Norwood did not pay for the hay because, according to Norwood, Hicks had failed to pay him on the lease. Norwood, in effect, offset the hay payment against the lease obligation. No evidence was provided regarding the amount owing on the lease.

25. A snapshot of how certain transactions occurred as between Norwood and Hicks is as follows:

Norwood endorsed cotton checks back to Hicks (or Desert Farms) who would, in turn, use the proceeds to produce silage. In producing the silage, Hicks paid various expenses,

including, on April 28, 2006, the sum of $30,917 to Brice Bedford for silage harvest, and the sums of $11,384.22 and $17,974.96, to Flat Top Dairy for rent and electricity, respectively. Hicks Ex. 33. On the same day, April 28, Desert Farms made a $30,000 payment against the 620K note.

26. Norwood added the sum of $21,817.50 to the note balance which represented a payment he made to a co-op for 2004 cotton. It was not a direct advance to Hicks.

27. Hicks filed a prior bankruptcy in 1991. In addition, in 2000, a company commonly referred to as "Gaines County Peanuts," of which Hicks was president and one of the two shareholders, filed a bankruptcy proceeding.

28. In the Statement of Financial Affairs filed by Hicks, he failed to list, at item eighteen, his prior ownership of Overland Farms, Inc., an entity through which he farmed approximately eight hundred acres of land. By an arbitration award dated May 31, 2006, Overland Farms, Inc. was denied recovery on an arbitration claim it had made. Norwood Exs. 19 and 20.

29. Hicks denied that he is an officer of Desert Farms. Despite this, he signed a letter dated April 10, 2006, as president of Desert Farms, Inc. Norwood Ex. 20. In addition, the 2005 tax return for Desert Farms reflects that Hicks was president. Hicks Ex. 43.

30. Hicks failed to list a small amount of royalty payments on his Statement of Financial Affairs, at item two.

31. Hicks testified that he realized in late April 2006 that he would be unable to repay in full the loans made by Norwood.

32. Hicks denies that he ever promised Norwood there was sufficient cotton in storage to cover the additional advances made by Norwood endorsing cotton checks back to him. Hicks

further denies making any representation regarding his ability to repay the loan. He testified that he made no false statements to Norwood.

33. These findings of fact shall, as necessary, constitute conclusions of law.

## Conclusions of Law

34. The Court has jurisdiction over this matter under 28 U.S.C. § 1334(b); this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

35. Norwood contends that the shortfall between total crop proceeds and the payments made against advances was caused by Hicks's misrepresentations, and that the shortfall should be declared nondischargeable under subsections 523(a)(2)(A) and (a)(4) of the Bankruptcy Code. Hicks denies making any misrepresentations and submits that, to the extent all crop proceeds were not used to satisfy his indebtedness to Norwood, there was simply insufficient funds to satisfy the debt in full, in light of the allowable expenses he had in producing the crops.

### Subsections 523(a)(2)(A) and (a)(4)

36. Section 523(a)(2)(A) states in relevant part:

> A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A). The terms "false pretenses," "false representation," and "actual fraud," as used in the dischargeability exception, have acquired the meaning of terms of art and are common law terms. *See In re Mercer*, 246 F.3d 391 (5th Cir. 2001), citing *Field v. Mans*, 516 U.S. 59 (1995).

- 10 -

37. For a debt to be nondischargeable under the discharge exception for debts obtained by false pretenses, a false representation, or actual fraud, the creditor must show, by a preponderance of the evidence, that (1) the debtor made a representation, (2) the debtor knew the representation was false, (3) the representation was made with the intent to deceive the creditor, (4) the creditor actually and justifiably relied on the representation, and (5) the creditor sustained a loss as a proximate result of its reliance. *See In re Acosta*, 406 F.3d 367 (5th Cir. 2005). Concealment of or silence regarding a material fact can constitute a fraudulent misrepresentation. *See Mercer* at 404; *see also Acosta* at 372. A misrepresentation need not be spoken; it can arise by conduct. *Mercer* at 404.

38. Section 523(a)(4) provides that an individual debtor will not receive a discharge of any debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. 11 U.S.C. § 523(a)(4).

39. A fiduciary under section 523(a)(4) involves a relationship arising out of a technical or express trust. *In re Rea*, 245 B.R. 77, 87 (Bankr. N.D. Tex. 2000), citing *In re Tran*, 151 F.3d 339, 342 (5th Cir. 1998) and *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934).

40. Most courts recognize that "the 'technical' or 'express' trust requirement is not limited to trusts that arise by virtue of a formal trust agreement, but includes relationships in which trust-type obligations are imposed pursuant to statute or common law." *LSP Investment Partnership v. Bennett (In re Bennett)*, 989 F.2d 779, 784-85 (5th Cir. 1993) citing, e.g., *Moreno v. Ashworth*, 892 F.2d 417, 421 (5th Cir. 1990) (officer of a corporation owed common law fiduciary duty to corporation and stockholders sufficient to satisfy requirements of section 523(a)(4); *Lewis v. Short (In re Short)*, 818 F.2d 693, 695-96 (9th Cir. 1987) (Washington

common law imposed trustee-like duties on partners of partnership); *Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir. 1986) (California common law imposed trustee-like duties on all partners of partnership); *Carey Lumber Company v. Bell*, 615 F.2d 370, 374 (5th Cir. 1980) (Oklahoma Lien Trust statutes creased an express trust)). Thus, the concept of fiduciary under section 523(a)(4) can be met by statute, common law or a formal trust agreement. *Id*. at 785.

41. State law determines whether the trust relationship must exist at the time of the wrongdoing. *In re Gupta*, 394 F.3d at 350; *In re Barrett*, 156 B.R. at 533. "[A] trust must exist 'prior to the wrong and without reference to it' in order to constitute a "technical trust" within the non-dischargeability provision." *In re Gupta*, 394 F.3d at 350 (quoting *Angelle v. Reed (In re Angelle)*, 610 F.2d 1335, 1340 (5th Cir. 1980)) (internal citations omitted). It is not enough that the debtor, based on the wrongdoing from which the contested debt arose, can be charged as a trustee *ex maleficio*. *Id*. at 350 (citing *Davis v. Aetna Accept. Co.*, 293 U.S. 328 (1934).

42. The section 523(a)(4) exception to discharge also applies if the debtor's actions constitute "embezzlement" or "larceny." 11 U.S.C. § 523(a)(4). However, "[u]nlike debts arising out of fraud or defalcation, those arising out of embezzlement or larceny need not involve a fiduciary." *In re Adams*, 348 B.R. 368, 373 (Bankr. E.D. La. 2005). Federal courts look to federal common law for the interpretation of these two crimes and are not bound by state law definitions. *See In re Barrett*, 156 B.R. at 533 n.3.

43. Larceny is defined as the "felonious taking of another's personal property with intent to convert it or deprive the owner of same." *Id*. It has also been defined as the "fraudulent and wrongful taking and carrying away of the property of another with intent to convert it to the

taker's use and with intent to permanently deprive the owner of such property." *In re Hayden*, 248 B.R. 519, 526 (Bankr. N.D. Tex. 2000).

44. Embezzlement is defined as "fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *In re Miller*, 156 F.3d at 602. To prove embezzlement, it must be shown that the creditor entrusted the debtor with his property, that the debtor misappropriated the property, and that the debtor intended to defraud the creditor. *Id*. at 603. "[A debtor] can wrongfully appropriate [personal property] while acting under an erroneous belief of entitlement." *Id*.

Analysis of the Facts

45. Norwood consented to Hicks's use of certain crop proceeds. For example, Norwood routinely endorsed cotton checks over to Hicks.

46. It is not clear to the Court that Hicks was obligated to remit to Norwood the gross amount of the cotton proceeds. The gross amount was $717,209.88; the net amount was $596,076.85. The difference between the gross amount and the net amount was caused, for the most part, by the rent payments made. The rent payments were made in accordance with the Farming Lease between Norwood's company, Flat Top, and Hicks (and Desert Farms). The rent was based on a percentage of the crop. In addition, the Farming Lease had a financing component whereby Flat Top, as lessor, could advance costs of inputs and fuel by paying the providers directly with Hicks to repay such advances with interest at ten percent per annum. The lease further provided that all payments from purchasers and government program payments were to be made directly to Flat Top with Flat Top paying Hicks any amounts due after payment of rents, advanced expenses, and other amounts due Flat Top under the lease. In short, the Court

cannot discern from the evidence and from the manner in which the parties actually carried out their affairs -- both the lending transactions and the lease -- the precise amount of crop proceeds that were owned by Hicks. Norwood is charged with knowledge of the terms of the farm leases.

47. The parties did not carry out the lending relationship in accordance with the documents. Though the 620K note contemplated a loan amount of $620,000 that was to be repaid with interest by February 1, 2006, the advances exceeded the note amount by more than $100,000; and an amount of approximately $80,000 was advanced after the maturity of the note.

48. By departing from the terms of the loan documents, Norwood may have jeopardized his security interest. The security agreement specifically states that the liens secure the 620K note. The Court questions whether all advances, particularly advances made after the note's maturity, were made under the 620K note. Such advances may be more properly considered as additional and separate advances made by Norwood and made apart from the note. If so, the liens under the security agreement did not secure such advances.

49. To except a debt from discharge under section 523 of the Code, the debt itself must, for purposes of subsections (a)(2)(A) or (a)(4), arise from the wrongdoing. Even accepting that Hicks may have misrepresented his circumstance as a means to induce Norwood to release funds back to him, the Court cannot determine an actual amount of funds that were obtained through any misrepresentations. From the evidence, the Court can conclude that the total crop proceeds exceeded $873,000. This amount includes cotton proceeds of $717,209.88, watermelon proceeds of $15,509.22, hay proceeds of $12,058.20, silage proceeds of $95,033.57, and seed proceeds of $33,901. But, as set forth above, the net cotton proceeds were approximately $596,000. The evidence reflects that Hicks paid over $9,200 in harvesting expense for the watermelons. Given

the nature and the resulting complexity of the transactions between Hicks and Norwood, the Court cannot conclude that Hicks's payment of the harvesting expenses was improper vis-a-vis Norwood. The parties had a dispute regarding the hay. But the effect of such dispute and its resolution, and the ultimate amount of hay proceeds that were turned over to Norwood, is unclear. As for the silage, the evidence reveals that several of the 2006 advances were for silage. *See* Hicks Ex. 30. There were also significant advances made in 2006 for utility bills ($40,557.41) and fertilizer ($30,710). As noted above, it is not clear that the crop proceeds continued to secure the post-maturity advances. And, given the terms of the Farming Lease, the Court cannot conclude that such advances were procured through Hicks's misrepresentations.

50. From the evidence, the Court cannot reconcile the total crop proceeds received with the total payments made. For example, the November 7, 2005 cotton check of $59,461.13 (see paragraph 14 above) was the net cotton proceeds, but the payment made against the 620K note was $40,000. This shortfall of approximately $20,000 was apparently used to pay expenses. The problem, however, is that the Court cannot conclude that this shortfall resulted from fraud or a misrepresentation by Hicks.

51. While discrepancies exist, and Hicks's history indicates a penchant to misrepresent facts, the Court cannot identify, from the evidence presented, the precise loss caused by an identifiable misrepresentation, or series of misrepresentations, made by Hicks. Norwood did not attempt, either in discovery or during trial, to link specific misrepresentations with a discrete loss amount.

52. From Norwood's testimony, the Court determines that Hicks generally made the following representations: (1) that there was sufficient cotton in storage to pay the debt; (2) that

he (Hicks) had a good crop and that, if not explicitly so stated, an inference could be made that the crop would generate sufficient revenues to pay the debt; and (3) that immediate funds were needed to pay outstanding bills. The representations were made within the context of Norwood consenting to Hicks's use of crop proceeds for his continued farming operations.

53. It is not clear from the evidence that these representations were made each time Norwood endorsed a check over to Hicks.

54. The nature of the alleged misrepresentations is unclear. The representations may constitute statements regarding Hicks's financial condition, which would except the representations from section 523(a)(2)(A). Section 523(a)(2) of the Code excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by -- (A) false pretenses, a false representation, or actual fraud, *other than a statement respecting the debtor's … financial condition*[.]" 11 U.S.C. § 523(a)(2)(A) (emphasis added). In analyzing this provision and the implications of 523(a)(2)(B), one court observed that "false oral statements made by a debtor regarding his 'financial condition' lead to a debt that is dischargeable, while false written statements of financial condition do not." *In re Bogdanovich*, 292 F.3d 104, 107 (2nd Cir. 2002).

55. The *Bogdanovich* court noted that courts are sharply split on whether the exception for statements respecting the debtor's financial condition should be interpreted broadly or narrowly. *Id.* at 112-13 (collecting cases). "A broad interpretation would include any statement that reflects the financial condition of the debtor. On the other hand, a narrow interpretation would find that a statement relates to financial condition only when it provides information 'as to [a debtor's] overall financial health.'" *Id.* at 112 (internal citations omitted).

56. Several courts have addressed whether certain statements speak to the overall financial health of the debtor sufficient to satisfy the narrow interpretation of the exception. *See id.* at 113 (citing *Weiss v. Alicea (In re Alicea)*, 230 B.R. 492, 504 (Bankr. S.D. N.Y. 1999) (holding that statement about debtor lacking present ability to pay was essentially statement of insolvency); *In re Sansoucy*, 136 B.R. 20, 23 (Bankr. D. N.H. 1992) (holding that representation as to financial solvency of partnership was statement of financial condition because it reflected overall economic condition of partnership); *Volk of Phila., Inc. v. Gelfand (In re Gelfand)*, 47 B.R. 876, 878 (Bankr. E.D. Pa. 1985) (construing representation of solvency as financial statement), overruled on other grounds, *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)).

**Conclusion**

57. Norwood consented to Hicks's use of the crop proceeds to pay certain expenses. In addition, it is not clear that Hicks was obligated to remit *all* crop proceeds, i.e., the gross cotton proceeds, to Norwood. The confusion regarding Hicks's obligation to Norwood is exacerbated by the fact that Norwood continued to make advances after the maturity of the $620,000 note and the effect this may have had on the liens that purportedly secured such advances. The evidence does not link a specific loss with an identifiable misrepresentation or series of misrepresentations. Finally, the Court questions whether the representations made places Norwood's claim outside the purview of section 523(a)(2)(A).

58. The evidence is insufficient to support a holding that the relationship between Hicks and Norwood constitutes an express or technical trust sufficient to satisfy the fiduciary requirement of section 523(a)(4). At trial, Norwood did not contend that Texas law imposed a

fiduciary responsibility flowing from Hicks to Norwood. There is certainly no evidence of a formal trust arrangement between the parties. The Court has not been cited to any common law that imposes fiduciary obligations on the borrower vis-a-vis the lender in a secured transaction. To succeed on a fraud or defalcation claim under 523(a)(4) there must be a fiduciary relationship. Given no fiduciary relationship exits under the facts of this case, Norwood cannot succeed on an (a)(4) fraud or defalcation claim.

59. The facts do not support a claim of larceny. Larceny requires that the taking or carrying away of the personal property be wrongful. There is no evidence to support such a claim. Thus, a claim of larceny under subsection (a)(4) must fail.

60. Upon the same analysis as the Court has provided on all other issues, the Court concludes that any claim by Norwood for embezzlement must also fail. Embezzlement was not a focus of Norwood's arguments at trial of the matter.

61. The Court cannot conclude, from a preponderance of the evidence, that the debt owed to Norwood should be declared nondischargeable under subsections 523(a)(2)(A) or (a)(4) of the Bankruptcy Code.

62. These conclusions of law shall, as necessary, constitute findings of fact.

### End of Memorandum Opinion ###